392          November 21, 2013          No. 55

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review*,

*v.*

STEVEN NICHOLAS BACKSTRAND,
*Petitioner on Review.*

STATE OF OREGON
*Petitioner on Review*,

*v.*

STEVEN NICHOLAS BACKSTRAND,
*Respondent on Review.*

(CC C071116CR; CA A136163;
SC S058019 (Control), S058318)

En Banc

On review from Court of Appeals.*

Argued and submitted June 8, 2011; resubmitted January 7, 2013.

Anna Marie Joyce, Assistant Attorney General, Salem, argued the cause for petitioner on review State of Oregon. On the brief were John R. Kroger Attorney General; Mary H. Williams, Solicitor General; and Jamie K. Contreras, Assistant Attorney General.

Neil F. Byl, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause for respondent on review Steven Nicholas Backstrand. With him on the brief was Peter Gartlan, Chief Defender.

LINDER, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

_____

* Appeal from Washington County Circuit Court, Donald R. Letourneau, Judge. 231 Or App 621, 220 P3d 748 (2009).

Walters, J., concurred in the judgment and filed an opinion in which Baldwin, J., joined.

Brewer, J., concurred in the judgment and filed an opinion.

**LINDER, J.**

In two recent cases, we have held that officers who had lawfully seized individuals for purposes of investigation also could, consistently with Article I, section 9, of the Oregon Constitution, request and verify the individuals' identifications. In particular, in *State v. Fair*, 353 Or 588, 609, 302 P3d 417 (2013), we held that an officer may temporarily detain a person whom the officer reasonably suspects of being a material witness to or victim of a recent or ongoing crime. We further held that, under the circumstances of that case, the officer constitutionally could request the witness's identification and check for outstanding warrants against her, in an attempt to verify the witness's identity and to obtain information otherwise relevant to the officer's investigation. *Id.* at 614. After deciding *Fair*, we decided *State v. Watson*, 353 Or 768, 305 P3d 94 (2013). In *Watson*, we held that an officer, in the course of a lawful stop for a traffic offense, may request the driver's identification and check the status of his or her driving privileges. *Id.* at 782.

This case presents yet a third variation on the issues that arise when police seek identification from persons with whom they deal in the course of their work: Does an officer's request for and verification of a person's identification, in and of itself, convert an encounter that is not a seizure for constitutional purposes into one that is? As we explain, we hold that the answer is no. Consequently, we reverse the decision of the Court of Appeals and affirm the judgment of the trial court.

## I.   FACTS AND PROCEDURAL HISTORY

Deputy Gerba was monitoring a "triple-X" store that sells adult sexual materials (toys, videos, clothing, etc). The store had been robbed several times in the recent past, and law enforcement had made frequent security checks on it as a result. On the particular night involved in this case, Gerba was "sitting on" the store, meaning that he was monitoring it from outside and across the street, as well as by occasionally going inside.

At about 1:00 a.m., Gerba was inside the store at the same time that defendant and his girlfriend were inside

shopping. Gerba thought that defendant looked "pretty young" and believed he might be under the posted 18-year minimum age to be in the store. Gerba knew that, if they were minors, as he suspected, the store could "get in trouble" because of the "pretty explicit stuff" that was readily visible to anyone inside.[1] Gerba therefore approached the two and asked their ages. Defendant answered that he was 22. Gerba asked both defendant and his girlfriend if they had any identification, and they gave him their driver licenses. Gerba called dispatch to verify the validity of the licenses.[2] After having the licenses for a total of 10 to 15 seconds, Gerba returned them to defendant and his girlfriend and wished them a good day.[3] Gerba then left the store to continue to monitor it from outside, while defendant and his girlfriend continued to shop inside.

        Gerba had not asked dispatch to check on anything other than the validity of the licenses, such as outstanding warrants. Even so, dispatch called Gerba back to advise him that defendant's license was suspended and defendant was on probation in another county. That call came about a minute after Gerba returned the licenses, as Gerba was leaving the store. Gerba continued across the street, where he maintained his security watch on the store. After about five minutes, defendant and his girlfriend walked out of the store, got in their car, and left, with defendant driving. Based on his belief that defendant was driving with a suspended license, Gerba pursued them, initiated a traffic stop, and arrested defendant. Defendant was later tried for driving

---

[1] It is a misdemeanor offense for the owner, operator, or manager of a business to permit minors, if not accompanied by a parent or lawful guardian, to enter or remain where obscene materials are displayed. ORS 167.080.

[2] Gerba testified that, although he could have determined both defendant's and the girlfriend's age from the face of the licenses, he ran the licenses through dispatch to make sure that they were not "fake." He explained, "[w]hen somebody has a fake ID, if we run it, it comes back unable to locate."

[3] Defendant's girlfriend testified at the suppression hearing, but defendant did not. According to her, Gerba asked for their IDs, and they gave them to him. After Gerba called to verify them, he handed them back, explaining to the two that they "looked awful young." He then said, "thank you." The only significant difference between Gerba's and the girlfriend's testimony was that the girlfriend described Gerba as holding the licenses for "several minutes" before returning them. The trial court, however, expressly found the historical facts to be as Gerba had related them and made the specific factual finding that Gerba had possessed the licenses for only 10 to 15 seconds.

while revoked (his license actually had been revoked, rather than suspended).

Before trial, defendant moved to suppress all evidence from his encounter with Gerba in the store (*i.e.*, his identity and the status of his driving privileges), arguing that Gerba had unlawfully "stopped" defendant either when he requested defendant's identification or, in the alternative, when he called dispatch to verify defendant's identification. The state responded that the encounter between Gerba and defendant had not amounted to a seizure or, if it had, Gerba's actions were supported by his reasonable suspicion that defendant was not old enough to be inside the age-restricted store.

The trial court denied defendant's motion, concluding that Gerba had not seized defendant. The trial court reasoned that the time involved—10 to 15 seconds—was *de minimis* and Gerba had not investigated defendant for any possible wrongdoing on his part, but rather, had attempted to determine if he was a minor as a protective measure, in which case he should not have been in the adult-only store.[4] The trial court concluded that, in that situation, a reasonable person in defendant's position would not feel significantly restrained by the officer's request for, and verification of, defendant's identification. After a bench trial, the trial court found defendant guilty of driving while revoked.

---

[4] Justice Walters's concurring opinion characterizes Gerba's interaction with defendant as conduct that "would cause a reasonable person in defendant's position to believe that he was the subject of a criminal investigation and therefore that he must stop, respond, and remain." *See, e.g.*, 354 Or at 418, 419-20 (Walters, J., concurring in the judgment) (officer's investigation of validity of defendant's license would reasonably be perceived as investigation of one or more identity-related crimes). In our view, as our analysis will reveal, the fact that an officer asks a citizen for cooperation in the course of conducting a criminal investigation is not a talisman in the analysis, as it is for Justice Walters. For that reason, we decline to debate whether a person in defendant's position would have believed he was the subject of a "criminal investigation." We note only that the proposition seems especially doubtful in this setting. Three statutes that Justice Walters cites as "crimes" that, objectively, defendant might have thought the officer to be investigating are simply inapplicable in this circumstance. *See* ORS 162.247(1)(a) (crime to prevent officer from performing lawful duties); ORS 162.385 (crime to give false information to officer when being cited for crime); ORS 807.620 (crime to give false information to officer enforcing motor vehicle laws). And it seems like a stretch to say that a reasonable person who had not attempted to buy anything in the store or produced identification to that end would have believed he was being investigated for a violation of ORS 165.805 (crime for minor to misrepresent age to secure a benefit by law denied to minors).

On appeal, the Court of Appeals concluded that, from an objective standpoint, defendant had been seized. *State v. Backstrand*, 231 Or App 621, 632, 220 P3d 748 (2009). The court was divided on its rationale, however, particularly as to the point at which the seizure had objectively occurred. The lead opinion concluded that, when Gerba called dispatch, a reasonable person in defendant's position would have believed that he was not free to leave while the call was being made. *Id*. at 626. The lead opinion remanded to the trial court to determine whether defendant also subjectively felt that he was not free to leave at that point. *Id*. at 632.[5] The lead opinion concluded that, if the trial court were to find that defendant subjectively felt restrained, then Gerba had unlawfully seized defendant.[6] *Id*. at 625-26. The lead opinion further concluded that if, on remand, the trial court determined that defendant subjectively felt restrained, the evidence of the status of defendant's driving privileges should be suppressed. *Id*. at 632.

A concurring opinion took a different view on the "timing of the operative 'stop.'" *Id*. at 633 (Haselton, P. J., concurring). According to the concurrence, Gerba seized defendant "when, in response to Gerba's inquiries, defendant produced, and Gerba took, defendant's driver's license." *Id*. Under that view, the concurrence agreed that suppression was required if defendant subjectively felt restrained once he handed his license to Gerba. *Id*. at 642. Finally,

---

[5] After the Court of Appeals issued its decision, this court decided *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010), in which we revised the test for a seizure under Article I, section 9, by abandoning the prong that considered a defendant's subjective belief that his liberty or freedom of movement was significantly restrained. In light of *Ashbaugh*, the remand that the Court of Appeals ordered was unnecessary.

[6] The lead opinion reasoned that any seizure of defendant would be unlawful because the officer had no reasonable suspicion that defendant was engaged in criminal activity. We recently held in *Fair*, however, that an officer may, in appropriate circumstances, constitutionally stop and detain a person on reasonable suspicion that the person is a material witness to or victim of a crime. 353 Or at 609. Here, the trial court expressly found that the officer reasonably believed that defendant and his girlfriend may have been minors and that he asked for and verified their ages as a protective measure to determine if they were in fact minors in an adult-only store. We need not decide whether, under *Fair*, the officer reasonably could have seized defendant as a potential witness or victim under the circumstances presented in this case because we conclude that defendant was not seized. For present purposes, it suffices to note that the Court of Appeals' rationale for concluding that the seizure would have been unlawful was too narrow.

according to a dissenting opinion, the lead opinion was cor-
rect that Gerba had seized defendant when Gerba made the
call to dispatch, but suppression was not required. *Id*. at 643
(Deits, S. J., dissenting).[7]

　　Both defendant and the state sought review, and we
originally held the petitions pending our decision in *[State
v. Ashbaugh](#)*, 349 Or 297, 244 P3d 360 (2010). After issuing
our decision in *Ashbaugh*, we allowed both the petitions. On
review, the state renews its assertion that defendant was
not seized at any point during his encounter with Gerba. In
the state's view, Gerba's actions in requesting and verify-
ing defendant's identification were not a sufficient restraint
on defendant's liberty or freedom of movement to amount
to the seizure of defendant. Defendant argues the converse,
urging that he was seized either when Gerba requested and
obtained his identification, or when Gerba called dispatch,
because a reasonable person in defendant's position would
have believed that he was not free to continue shopping
until the officer's investigation was complete.

## II.   ANALYSIS

### A.   *General Principles Governing Seizures*

　　As we explained at the outset, the central question
that this case presents is: Does an officer's request for and
verification of a person's identification, in and of itself, con-
vert an encounter that is not a seizure for constitutional pur-
poses into one that is? The general principles that guide our
answer to that question are well-settled and were discussed
at some length in our two most recent "stop" cases, *Fair*,
353 Or at 593-95, 598-603, and *Watson*, 353 Or at 773-74,
778-80. For our analysis here, it is helpful to summarize
those principles.

　　Article I, section 9, guarantees individuals the
right to be "secure in their persons *** against unreason-
able search, or seizure." As this court has long recognized,
encounters between law enforcement officers and citizens are
of an "infinite variety." *State v. Holmes*, 311 Or 400, 406, 813
P2d 28 (1991). Of that infinite variety, "only some implicate

---

[7] Because we decide that defendant was not seized, we do not describe the
Court of Appeals' various views on whether suppression was required.

the prohibition in Article I, section 9, against unreasonable 'seizures.'" *Ashbaugh*, 349 Or at 308. As we have described in numerous cases:

> "Analytically, police-citizen encounters typically fall into one of three categories that correlate the degree of intrusiveness on a citizen's liberty with the degree of justification required for the intrusion. At one end of the continuum are mere encounters for which no justification is required. At the other end are arrests, which involve protracted custodial restraint and require probable cause. In between are temporary detentions for investigatory purposes, often termed 'stops,' which generally require reasonable suspicion. Both stops and arrests are seizures for constitutional purposes, while less restrictive encounters are not."

*Fair*, 353 Or at 593-94 (citations and footnote omitted).

What distinguishes a seizure (either a stop or an arrest) from a constitutionally insignificant police-citizen encounter "is the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty." *Ashbaugh*, 349 Or at 309. The test is an objective one: Would a reasonable person believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement. *Id*. at 316.[8] Because of the diversity of potential police-citizen encounters, the inquiry necessarily is fact-specific and requires an examination of the totality of the circumstances involved. *Holmes*, 311 Or at 408. As we recently acknowledged in *Fair*, "in practice, the line between a 'mere encounter' and something that rises to the level of a 'seizure' does not lend itself to easy demarcation." 353 Or at 595. Rather, as this court recognized in *Holmes*, the standard is necessarily vague "when

---

[8] In clarifying the test in *Ashbaugh*, we described it as having two prongs, either of which can result in a constitutionally significant seizure. 349 Or at 304. One prong asks whether an officer has intentionally and significantly restricted the individual's liberty or freedom of movement; the other asks if a reasonable person would believe that the officer has so restricted him or her. *Id*. at 309. The state in this case urges us to reconsider that test and eliminate the first prong, reasoning that it is subsumed in the second and adds nothing of independent value to the analysis. As the parties agree, however, this case involves only the second prong of the test—that is, what a reasonable person would believe based on the officer's conduct. We decline the state's invitation to revisit the value of the first prong of the test in a case that does not adequately implicate it.

unadorned by judicial interpretation based upon specific fact situations" and does not provide "a ready answer for every conceivable" police-citizen encounter that can arise. 311 Or at 410. As a result, "In many cases it is clear that a person has been 'seized.' But there are many instances in which it is less obvious whether a police-citizen encounter is a 'seizure.'" *Id*. at 407.

Although close cases can—and frequently do—arise, beginning with *Holmes*, this court has remained steadfast in recognizing that the constitutional concern is with police-imposed restraints on citizen liberty, not with limiting contacts between police and citizens. In an oft-cited and oft-quoted passage, *Holmes* stressed that "law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful." 311 Or at 410; *see also State v. Gerrish*, 311 Or 506, 513, 815 P2d 1244 (1991) (flagging down driver and directing him to stop not a significant interference with driver's liberty where those are only means available to get driver's attention long enough to request information). The fact that the citizen is discomforted by an officer's approach and request for assistance or information—either because the officer is a known police officer, or because the encounter otherwise involves "inconvenience or annoyance"—does not make the contact a seizure. *Holmes*, 311 Or at 410. Rather, a seizure exists only if the officer's conduct would be reasonably perceived as coercive in the sense that it would cause the citizen to reasonably believe that the officer is intentionally restraining the citizen's liberty or freedom of movement in a significant way—that is, in a way that exceeds the bounds of ordinary social encounters between private citizens. *Id*. at 409-10.[9]

---

[9] Justice Walters, in her concurrence, relegates her discussion of the analytical construct adopted in *Holmes* to a footnote and essentially treats *Holmes* as superfluous to the analysis. 354 Or at 424 n 3 (Walters, J., concurring in the judgment). Justice Brewer, in his separate concurrence, expresses his view that the *Holmes* construct of "mere conversation" is a fiction and less than helpful to the analysis. 354 Or at 428, 431-32 (Brewer, J., concurring in the judgment of the court). As this court observed most recently in *Ashbaugh*, our efforts "to explain what the constitutional term 'seizure' embraces" have not been entirely successful or satisfying. 349 Or at 310. We could make the same observation about the

Thus, a "show of authority" as used in this context is shorthand for a more precise concept. The fact that a law enforcement officer conveys his or her official status as such—as officers do by, for example, wearing uniforms, displaying their badges, driving in marked patrol cars, and verbally identifying themselves as police officers—is not a "show of authority" that gives rise to a seizure in the constitutional sense. What is required is a reasonable perception that an officer is exercising his or her official authority to restrain. Explicitly or implicitly, an officer must convey to the person with whom he is dealing, either by word, action, or both, that the person is not free to terminate the

general fabric of constitutional seizure law from which *Holmes* borrowed the analysis. *See Holmes*, 311 Or at 407 (citing *State v. Warner*, 284 Or 147, 161, 585 P2d 681 (1978), which in turn embraced the analysis that had developed under the Fourth Amendment); *see generally* Wayne R. LaFave, 4 *Search and Seizure* § 9.1-9.4, 352-645 (5th ed 2012) (exhaustive discussion of legal developments post-*Terry v. Ohio*, 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968), by which arrests and temporary detentions are subject to constitutional protection against unreasonable seizures, but nonforcible or noncoercive encounters are not).

Our adherence to *Holmes* in this case does not mean that our work in refining what constitutes a "seizure" for purposes of Article I, section 9, is done. But *Holmes* has been a settled part of our Article I, section 9, jurisprudence for more than two decades, and we have reembraced it as recently as *Watson,* 353 Or at 774, *Fair*, 353 Or at 593-94, and *Ashbaugh*, 349 Or at 308-09, albeit with modest refinement in *Ashbaugh*. The parties' arguments throughout—from the trial court proceedings through briefing and argument in this court—have been based on acceptance of the essential construct that *Holmes* announced. In a proper case, and with considered arguments by the parties before us, we can continue to examine the scope of the term "seizure" for purposes of Article I, section 9, and the law in that regard appropriately should continue to evolve. Justice Brewer is not alone in his dissatisfaction with the prevailing analysis. *See, e.g.*, Edwin J. Butterfoss, *Bright Line Seizures: The Need for Clarity in Determining When Fourth Amendment Activity Begins*, 79 J Crim L & Criminology 437, 439 (1988) (it is generally accepted that, in fact, citizens almost never feel free to end an encounter initiated by a police officer and walk away; literal application of a "free-to-leave" test would result in virtually all police-citizen encounters being seizures); *see also* Lewis R. Katz, *Terry v. Ohio at Thirty-Five: A Revisionist View*, 74 Miss L J 423, 458 n 177 (2004) (most citizens do not feel free to terminate an encounter with police when approached in a public place, and such contacts are "regrettably" characterized as "mere encounters" (quoting Robert J. Burnett, *Random Police-Citizen Encounters: When is a Seizure a Seizure?*, 33 Duq L Rev 283, 287 (1995)). But a change to the constitutional standard must be made consistently with our criteria for altering settled precedent. *See generally Farmers Ins Co v. Mowry*, 350 Or 686, 693-94, 261 P3d 1 (2011) (discussing application of *stare decisis* in cases involving constitutional provisions). As important, such a change must be animated by and tailored to policies embodied in the terms of Article I, section 9, and not our own normative values of how police and citizens do or should interact. Unless and until those considered arguments are before us, we properly adhere to *Holmes*.

encounter or otherwise go about his or her ordinary affairs. Necessarily, then, the fact that an individual—for reasons personal to that individual—feels obliged to cooperate with the officer simply because of the officer's status is not the form or source of coercion that is of constitutional concern. As *Holmes* held, 311 Or at 410, and as other authorities have observed of the parallel federal standard for what constitutes a seizure, police need not articulate any particular degree of suspicion to "to seek cooperation, even where this may involve inconvenience or embarrassment for the citizen, and even though many citizens will defer to this authority of the police because they believe—in some vague way—that they should." American Law Institute, *A Model Code of Pre-Arraignment Procedure* § 110.1, 258 (1975) (*Model Code*). Professor LaFave agrees, acknowledging that,

> "if 'the moral and instinctive pressures to cooperate are in general sound and may be relied on by the police,' then a street encounter does not amount to a *** seizure merely because of those pressures—that is, merely because the other party to the encounter is known to be a policeman."

Wayne R. LaFave, 4 *Search and Seizure* § 9.4(a), 581 (5th ed 2012) (quoting *Model Code* § 110.1 at 258 (footnote omitted)).[10] Rather, "the confrontation is a seizure only if the officer *adds to those inherent pressures* by engaging in conduct significantly beyond that accepted in social intercourse." *Id*. at 581-82 (emphasis added); *see generally Holmes*, 311 Or at 410 ("encounter is a 'seizure' of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse"). Again, what is required is a show of authority by which, through words or action, the officer's conduct reasonably conveys that the officer is exercising his or her authority to significantly restrain the citizen's liberty or freedom of movement.[11]

---

[10] *See also United States v. Tavolacci*, 895 F2d 1423, 1424 (DC Cir 1990) (federal seizure test "assumes that the citizen is aware of police duties to keep the peace and prevent crime, and that that awareness, coupled with feelings of civic duty, moral obligation, or simply proper etiquette, will often lead a reasonable person to cooperate" (internal quotations omitted)).

[11] The federal test under the Fourth Amendment is often described as whether a reasonable person would feel or believe himself to be "free to leave." *See, e.g.*, *United States v. Mendenhall*, 446 US 544, 554, 100 S Ct 1870, 64 L Ed 2d 497 (1980) (seizure within meaning of Fourth Amendment occurs "only if, in view of all of the circumstances ***, a reasonable person would have believed that he

B.  *Police Requests For Information or Cooperation Generally*

Consistently with *Holmes*'s declaration that officers remain free to approach citizens, request or impart information, and seek assistance, this court has cautioned that "verbal inquiries [by officers] are not *** seizures." [State v. Rodgers/Kirkeby](#), 347 Or 610, 622, 227 P3d 695 (2010). Rather, something more than just asking a question, requesting information, or seeking an individual's cooperation is required of an officer's conduct. The "something more" can be such things as the content or manner of questioning, or the accompanying physical acts by the officer, if those added factors would reasonably be construed as a "threatening or coercive" show of authority requiring compliance with the officer's request. *Ashbaugh*, 349 Or at 317; *see also State v. Ehly*, 317 Or 66, 76-77, 854 P2d 421 (1993) (mere requests for cooperation not seizures unless officer, through demeanor, tone, language, or totality of circumstances, conveyed a

---

was not free to leave"). But as this court recognized in *Holmes*, the feel-free-to-leave formulation does "not state the entire [federal] test for a 'seizure' of a person by a non-forcible 'show of authority.'" 311 Or at 413; *see also Gerrish*, 311 Or at 517 (whether reasonable person would feel free to leave "is not determinative" of federal analysis). Rather, as the Supreme Court has clarified, whether a reasonable person would have believed that he was not free to leave

"states a *necessary*, but not a *sufficient*, condition for *** [a] seizure effected through a 'show of authority.' *** [T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but *whether the officer's words and actions would have conveyed* that to a reasonable person."

*California v. Hodari D*, 499 US 621, 628, 111 S Ct 1547, 113 L Ed 2d 690 (1991) (last emphasis added). Under that more complete articulation of the federal test, the analysis of what constitutes a seizure under Article I, section 9, and under the Fourth Amendment is not meaningfully different. *See, e.g.*, *Holmes*, 311 Or at 414 (reasons for rejecting defendant's federal seizure claim "similar" to those for rejecting claim under Article I, section 9); *Gerrish*, 311 Or at 517-18 ("As with our analysis under Article I, section 9, we believe that the minimal intrusion of the encounter was not a constitutionally material interference with [the] defendant's liberty" under the Fourth Amendment.).

We decline to distill the test under Article I, section 9, to a feel-free-to-leave formulation. That formulation tends to direct the focus to a citizen's internal feelings, beliefs, and thoughts, while simultaneously distracting from the correct focus, which is the officer's words and actions and what *they* would convey to a reasonable person. We instead adhere to the test as we stated it in *Holmes* and revised it in *Ashbaugh*, which requires a show of authority by an officer that would cause a reasonable person to believe that the officer intentionally and significantly has restricted, interfered with, or otherwise deprived the citizen of the citizen's liberty or freedom of movement. *Ashbaugh*, 349 Or at 316.

restraint on liberty). Without the something more, however, "police inquiries in and of themselves require no justification and do not necessarily implicate Article I, section 9." *Rodgers/Kirkeby*, 347 Or at 624.

Several of our cases illustrate that principle in practice. One of the earliest is *Ehly*, which was decided about two years after *Holmes* first articulated the standard for distinguishing "mere encounters" from police conduct that results in a seizure for constitutional purposes. In *Ehly*, two officers confronted the defendant in a motel room after he refused to leave at check out and return the room key to the manager. The officers immediately told the manager to "stand back" and advised the defendant that he had to leave. When the defendant picked up two bags and started to leave, the officers asked him to return the key to the manager. The defendant replied that the key might be in one of the bags, but that the bags did not belong to him. One officer then asked him to find the key. The defendant tried, rummaging through one of the bags unsuccessfully, at which point the officer encouraged him to dump the bag's contents onto the bed because both of the defendant's hands were concealed within the bag as he searched for the key. When the defendant continued to search the bag, the officer, concerned that a weapon was in the bag, put her hand on her gun and ordered the defendant to "back up," which he did; the officer then grabbed the bag herself and dumped the contents out. *Ehly*, 317 Or at 68-72, 79.

This court concluded in *Ehly* that the defendant was seized for purposes of Article I, section 9, at the point that the officer ordered the defendant to back up. *Id.* at 79. The officers' requests before that point, individually and in combination, to leave, to find the key, and to dump out the contents of the bag did not, however, result in seizing him. Rejecting the defendant's argument that the requests were "'poorly disguised commands,'" the court reasoned that—in light of the trial court's factual findings—"nothing about the officers' demeanor, their tone of voice, the nature of their language, or the time, place, or manner of the encounter" supported a conclusion that a reasonable person would have believed that his liberty had been *significantly* restrained

before the officer directed him to stand back from the bag that defendant was searching through. *Id*. at 76, 78.[12]

*Ashbaugh* involved a similar conclusion on much different facts. In *Ashbaugh*, two officers on bicycles approached the defendant and her husband while they were sitting in a public park in the middle of the day. The officers investigated their identities and checked to see if either of them was wanted on outstanding warrants. When the officers learned that the defendant's husband was subject to a restraining order that prevented him from having contact with the defendant, the officers arrested him for violating that order and took him to a requested patrol car. About five minutes later, the officers returned to the defendant, who had not left the park, to tell her that her husband wanted her to take his belongings with her. On impulse, one of the officers asked the defendant if she had anything illegal in her purse. When she said she did not, he asked if he could search her purse, and she agreed. *Ashbaugh*, 349 Or at 300-02. The state conceded at a pre-trial proceeding that the initial contact with the defendant and her husband was an unlawful stop. *Id*. at 302-03 n 2.

Given the state's concession, the seizure question before this court was limited to whether the officers had seized the defendant when they recontacted her, asked her about the contents of her purse, and asked if she would permit them to search her purse. *Id*. at 306, 308. In concluding that the defendant was not seized at that point, this court acknowledged that "it is possible to restrict a person's liberty and freedom of movement by purely verbal means." *Id*. at 317. But we reasoned that nothing in the content of the questions asked, or in the officers' manner or actions, involved a "show of authority" that the defendant could reasonably construe as a threat or an exercise of authority to coercively restrain. The court observed that, "while it may have been true that [the] defendant had been unlawfully detained by

---

[12] As *Ehly* emphasized, the legality of a particular search depends significantly on the facts of a particular case, and what "actually happened is a question of fact for the trial court." 317 Or at 74-75. A trial court's findings of historical fact are binding on an appellate court and, if the trial court does not make express findings on all pertinent issues, the appellate court will view the record in a light most favorable to the trial court's ruling and presume that the facts were decided in a manner consistent with the trial court's ultimate conclusion. *Id*. at 75.

police some minutes before and had watched a clear show of authority directed at her husband, those circumstances had ended." *Id*. Consequently, this court concluded that the officer's questions to the defendant did not "intentionally and significantly" restrict or interfere with her liberty, and a reasonable person in the defendant's circumstances would not believe that they had. *Id*.

In other cases, the circumstances accompanying verbal questions or requests have led this court to conclude that the defendant was seized, not by an officer's questions *per se*, but given the context in which they were asked and the totality of the circumstances otherwise involved. *Rodgers/Kirkeby*, in particular, emphasized the importance of context. *Rodgers/Kirkeby* involved two cases consolidated for purposes of the court's opinion. Both involved lawful stops of vehicles for traffic offenses. In *Rodgers*, officers completed their investigation of the offense, but did not issue a citation. Then, although he lacked reasonable suspicion, one of the officers proceeded to question the defendant about possible drug activity and to ask for consent to search without advising the defendant that he was free to leave. 347 Or at 613-15, 626. In *Kirkeby*, after obtaining all information relevant to the reason for the stop, the officer asked for consent to conduct a patdown, after which he asked for consent to examine items in the defendant's pockets. *Id*. at 615-16.

This court determined that, in each instance, the questions and request for consent resulted in an unlawful seizure. *Id*. at 627-28. In explaining that conclusion, the court first acknowledged that, in general, "verbal inquiries are not searches and seizures," even when made in the course of, and unrelated to, a traffic stop. *Id*. at 622. The problem in *Rodgers/Kirkeby* was that the unrelated inquiries at issue were not in the due course of the traffic stop, but came afterwards—that is, they came at a point when the officers no longer had authority to detain the defendants. *Id*. at 623. As the court explained, "in contrast to a person on the street" or otherwise in public who has not been stopped for a traffic offense, a person detained for a traffic offense has a legal obligation to stop at the officer's direction and remain; the person may not unilaterally end the encounter

and leave whenever he or she chooses. *Id*. at 622-23. From the standpoint of a reasonable person in the defendants' position, when the officers in both cases, after completing the investigation of the traffic offenses, asked unrelated questions and asked for consent to search, but did not tell the defendants that they were free to leave, those verbal inquiries communicated a continuation of the traffic stop, even though the officers no longer had authority to detain. *Id*. at 627-28. In that distinctive context, the verbal inquiries alone continued the seizures, and continuation of the seizures was unlawful.

Finally, *State v. Jacobus*, 318 Or 234, 864 P2d 861 (1993), illustrates more generally how the manner of questioning and attendant circumstances may affect the analysis. There, an officer had been advised that the occupants of a particular Datsun car parked near a convenience store had been overheard by a customer saying that "there was only one clerk in the store." When the officer drove to the store, he saw the Datsun parked in an unlighted area nearby and drove past it. As he went past, the occupants frantically began to stuff objects under the seats. The officer made a U-turn, pulled in behind the Datsun, and turned on his patrol car's overhead lights. Two occupants got out of the car and walked toward the store. The officer approached the Datsun on foot. The defendant, who remained in the Datsun, continued to stuff something under coats and other items on the floorboard. When the officer asked the defendant to step out, he stayed in the Datsun. The officer repeated his request at least two more times before the defendant complied. *Id*. at 236. Characterizing the officer's repeated requests as "order[ing]" the defendant out of the car, the court held, without extended analysis, that the defendant's liberty was temporarily restrained because the defendant, at least at the moment of the order, was not free to "remain in the Datsun or even *** to get out of the Datsun and walk away." *Id*. at 240-41.[13] Implicit in the court's seizure

---

[13] The court analyzed the circumstances in *Jacobus* to determine if they constituted a stop for purposes of ORS 131.615(1). Well before that decision, this court had recognized that statute as codifying both the state and federal constitutional standards for a lawful investigatory stop based on reasonable suspicion of criminal activity. *See State v. Valdez*, 277 Or 621, 624-26, 561 P2d 1006 (1977) (discussing origins of stop statute); *see also State v. Kennedy*, 290 Or 493, 497,

analysis was its conclusion that the surrounding circumstances (patrol car parked behind the Datsun with overhead lights activated), coupled with the persistence of the officer's "requests," rendered those requests the functional equivalent of a command affirmatively communicating to the defendant that compliance was not optional.

C. *Police Requests for Identification and Verification of Identification*

Police requests for identification are a subset within the general category of police requests for information or cooperation. But asking for and verifying identification is not unique to police-citizen encounters. Rather, as other courts have observed, in this day and age, requests for valid government-issued identification are commonplace in ordinary dealings in society, both between private citizens as well as in a variety of citizen-government contexts (such as entering public buildings). *See, e.g.*, *Golphin v. State*, 945 So 2d 1174, 1189-90 (Fla 2006), *cert den*, 552 US 810 (2007) ("[T]he act of identifying oneself through presentation of valid, government-issued identification [is] a necessary part of a panoply of human endeavors, from cashing a check to boarding an airplane.").[14] Police officers, in their official dealings with citizens, likewise commonly seek to determine and verify with whom they are dealing for reasons that range from simply documenting the activities the officers engage in while on duty to ascertaining information that may assist in enforcement of the criminal laws. *See, e.g.*, *Fair*, 353 Or at 614 (officer checked potential witness for outstanding warrants as means of verifying identification and ascertaining information relevant to investigation

---

624 P2d 99 (1981) (Oregon stop statutes were intended to codify decisions by this court interpreting Article I, section 9, and the United States Supreme Court interpreting the Fourth Amendment), *rejected in part on other grounds by* <u>State v. Hall</u>, 339 Or 7, 20, 115 P3d 908 (2005), and *State v. Stevens*, 311 Or 119, 136-37, 806 P2d 92 (1991). Consequently, in a case involving suspicion of criminal activity, as *Jacobus* did, the analysis under Article I, section 9, necessarily would be the same as under ORS 131.615(1).

[14] *See also State v. Martin,* 2011-0082, p 9 (La 10/25/11); 79 So 3d 951, 957 (individual is "practically immobilized" in modern society without adequate identification); *People v. Jackson*, 39 P3d 1174, 1189 (Colo 2002) ("[t]he need for identification is pervasive in today's society"), *abrogated on other grounds by Brendlin v. California*, 551 US 249, 259, 127 S Ct 2400, 168 L Ed 2d 132 (2007).

of domestic assault); *State v. Ellenbecker*, 159 Wis 2d 91, 98, 464 NW2d 427, 430 (1990) (where it is reasonable for officer to ask for license, running status check on license carries out "deterrent function of the law").

Until now, this court has not been asked to decide—and has not in fact decided—whether an officer effectively seizes an individual simply by asking for an individual's identification. Where the issue is that straightforward—based on the request alone and nothing more—the circumstance comes well within the bounds of a "mere encounter," which, as we held in *Holmes*, police remain free to have with citizens without implicating Article I, section 9. 311 Or at 410. Asking for identification is exactly the kind of interaction that *Holmes* contemplated—a request for information and a citizen's cooperation. *Id*. Thus, we agree with the United States Supreme Court, which has held for purposes of the Fourth Amendment that an officer's questions relating to identity or a request for identification do not result in a seizure unless the circumstances of the encounter are "so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded." *INS v. Delgado*, 466 US 210, 216-17, 104 S Ct 1758, 80 L Ed 2d 247 (1984).[15] For purposes of Article I,

---

[15] The United States Supreme Court has adhered to that holding. *See, e.g.*, *Hiibel v. Sixth Judicial Dist Court of Nev*, 542 US 177, 185, 124 S Ct 2451, 159 L Ed 2d 292 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."). Thus, throughout the country, as a matter of governing federal law, there is no constitutional barrier to an officer requesting identification in what is otherwise a lawful officer-citizen encounter. The federal circuits have, however, split on the narrower question of whether and when *retention* of identification results in a seizure. One view is that it is a *per se* seizure whenever an officer retains identification longer than reasonably necessary to examine it. *See, e.g.*, *United States v. Jordan*, 958 F2d 1085, 1086 (DC Cir 1992) (seizure if officer retains identification after reasonable opportunity to review it, because it is "difficult to imagine that any reasonable person would feel free to leave without it" (quoting *United States v. Battista*, 876 F2d 201, 205 (DC Cir 1989)). The competing view is that retention of identification longer than reasonably necessary to review and verify it is a factor to consider, but is not dispositive in analyzing whether a citizen has been seized. *See, e.g.*, *United States v. Weaver*, 282 F3d 302 (4th Cir 2002) (so holding). In terms of state court interpretations of the parallel provisions of their own state constitutions, we have found no state court that holds that an officer's request for identification, without more, results in a citizen's seizure. Our review of both state and federal cases suggests that no court has held or would hold, as the concurrences would, that a seizure occurred under the circumstances presented in this case. *See* 354 Or at 418 (Walters, J., concurring in the judgment)

section 9, our conclusion is the same: A mere request for identification made by an officer in the course of an otherwise lawful police-citizen encounter does not, in and of itself, result in a seizure.

We have, however, decided cases in which we concluded, from the totality of circumstances, that police conduct that included a request for identification was sufficiently coercive to result in a seizure. The first of those cases was *State v. Warner*, 284 Or 147, 585 P2d 681 (1978). There, officers were investigating a reported armed robbery of a bar by two men late at night. The officers entered a second bar in a small town about 8 miles from the town where the robbery had occurred after seeing two men pull up to it and go inside. Without reasonable suspicion to believe that they were the men who committed the robbery, one officer stopped them as they began to leave. The officer told the two men about the robbery, said that he needed to ask them some questions, and asked them to return inside the bar; once back inside, the officers asked the men to remove their wallets from their pockets, take out their identifications, and place that identification on the table in front of them. The officer then informed the defendant that he could "be on [his] way" as soon as the officer was able to "clear this matter up." According to the officer, he did not order the defendant to do anything, and the defendant was not obligated to remain, although the defendant was not told that. *Id*. at 150-52. The court concluded that the officer's actions in having defendant place his identification on the table, coupled with his statement that he was investigating a robbery and that the defendant and his companion would be on their way as soon as officers could clear up the matter, was, given "all the circumstances," a temporary restraint of the defendant's liberty. *Id*. at 165.

---

(concluding the officer's conduct in asking for and verifying defendant's identification was a seizure); 354 Or at 432 (Brewer, J., concurring in the judgment of the court) (same). Nor do the other authorities on which Justice Walters relies support that result. *See, e.g.*, Aidan Taft Grano, *Casual or Coercive? Retention of Identification in Police-Citizen Encounters*, 113 Colum L Rev 1283, 1315-19 (2013) (under Fourth Amendment, police remain free to request and verify identification; better rule among the divided federal circuits, however, is that retention of identification longer than reasonably necessary is a *per se* seizure).

*State v. Painter*, 296 Or 422, 676 P2d 309 (1984), similarly involved more than a mere request for identification. In that case, a deputy asked the defendant to produce his identification when he encountered the defendant in an alley at 3:00 a.m. The defendant turned over an expired Virginia driver's license and credit cards. The deputy retained those items while he frisked the defendant, called in a radio check of the identification, waited for the results of the radio check, and inquired further about the make and location of the defendant's car, which the defendant explained was broken down nearby. *Id*. at 424. This court concluded that the deputy had seized the defendant, given that the "defendant was, in fact, unable to leave" and thereby was unable to terminate the encounter and avoid the frisk at the point when the deputy had "retained [the] defendant's license and credit cards." *Id*. at 425.

A final illustrative case is *State v. Hall,* 339 Or 7, 115 P3d 908 (2005). In *Hall*, an officer parked his vehicle next to the defendant as the defendant was walking along a street. The officer motioned for the defendant to approach the officer's vehicle, and the officer then exited his vehicle as the defendant neared. The officer asked to see the defendant's identification. When the defendant handed his identification to the officer, the officer radioed dispatch and requested a warrant check. While awaiting the results of the warrant check, the officer returned the identification and proceeded to question the defendant about whether he was carrying any weapons, knives, or illegal drugs. The defendant responded in the negative. In response, the officer asked the defendant for consent to search his person, and the defendant consented. The search revealed evidence of unlawful drug possession. *Id*. at 10-11.

This court concluded that the encounter began as a noncoercive engagement between the officer and the defendant, but evolved into a seizure in the course of the officer's investigation. The court explained that the officer's "initial actions of stopping his vehicle next to [the] defendant and then gesturing for [the] defendant to approach him did not intrude upon [the] defendant's liberty of movement[.]" *Id*. at 19. But the court concluded that the nature of the encounter changed when the officer took the defendant's identification

and conducted a warrant check. The court acknowledged that the officer promptly returned the defendant's identification, but maintained that, at that point, the defendant was aware that he was the subject of a pending warrant check and, because of that fact, it was "difficult to posit" that a reasonable person would have felt free to leave. *Id*. The court further observed that the officer

> "did nothing to dispel what would have been an objectively reasonable belief that defendant was restrained from leaving until [the officer] had received the results of the warrant check. Instead, immediately upon returning [the] defendant's identification card, [the officer] questioned [the] defendant about whether [the] defendant was carrying any weapons, knives, or illegal drugs, and he asked [the] defendant for consent to search [his] person."

*Id*.

In combination, *Warner*, *Painter*, and *Hall* confirm, at least implicitly, our holding today. Police remain free to approach citizens and to ask for or impart information and to seek their cooperation. Asking a citizen to identify himself or herself and to show police a formal piece of identification is a form of cooperation and involves the kind of information that, as a general proposition, police are free to request. But when the content of the questions, the manner of asking them, or other actions that police take (along with the circumstances in which they take them) would convey to a reasonable person that the police are exercising their authority to coercively detain the citizen, then the encounter rises to the level of a seizure, the lawfulness of which must be analyzed as such.

The purely legal issue that remains is whether verification of identification is a further circumstance that elevates a mere encounter to a seizure. We see no principled basis for concluding that, when an officer checks the validity of a proffered identity or piece of identification, such an action *per se* conveys to a reasonable person—who is not otherwise restrained and who has willingly tendered the information to the officer—that the officer is now exercising his or her authority to coercively restrain the person's liberty or freedom of movement. To be sure, as we have already discussed,

a person tendering identification to an officer may not subjectively feel comfortable refusing the officer's request. Instead, for any number of personal reasons or instincts, the person may be unwilling to decline the officer's request. Those internalized motivations and feelings, however, are not the test for whether there is a seizure under Article I, section 9.[16] A person who turns over identification to a law enforcement officer reasonably would expect that the officer will take steps to verify its validity. For the officer to do so does not objectively convey an exercise of the officer's authority to restrain the person's liberty or freedom of movement. The circumstance is akin to when a person gives valid consent to search. Part and parcel with giving consent is a reasonable person's expectation that he or she will likely either need or want to stand by while the officer performs the search. The person who waits while a consent *search* is completed is not thereby *seized* for purposes of Article I, section 9. So, too, with a person who, in a noncoercive setting, gives an officer his or her identification for the officer's examination. The fact that the officer conducts that examination is not, in and of itself, a basis to conclude that the otherwise noncoercive encounter has become a *coercive* restraint on the person's liberty.

## D.   *Analysis of the Circumstances of this Case*

With those conclusions in place, we turn to the specific circumstances of this case to determine whether Gerba, either by requesting defendant's identification or by verifying

---

[16] Social science studies confirm what courts and others have long recognized—that citizens often feel an internal inclination to cooperate with police officers. 354 Or at 420 (Walters, J. concurring in the judgment) (citing studies). They do not demonstrate that citizens believe, reasonably or otherwise, that officers are exercising their *official authority* to restrain them by a request for information or cooperation and that officers are thereby in fact restraining them. Indeed, some of the same social science suggests that affirmative advice that a person does not need to respond or is free to leave is unlikely to counter the internal inclination that many people feel to cooperate with an officer's request. *See, e.g.*, David K. Kessler, *Free to Leave? An Empirical Look at the Fourth Amendment's Seizure Standard*, 99 J Crim L & Criminology 51, 84-85 (2009) (social science shows that adding warning requirement would be of questionable value, because people who know their rights feel same obligation to cooperate as those who do not). Yet Justice Walters suggests that advice of that kind would preclude a conclusion that the encounter was a seizure. We are, therefore, unsure of the point of Justice Walters's reliance on those studies.

its validity, seized defendant for purposes of Article I, section 9.[17] As we will explain, we conclude that he did not.

As we previewed, defendant first argues that Gerba seized him by asking defendant his age and asking to see his identification. In making that argument, defendant focuses on the context in which Gerba made the request. In particular, defendant points to the fact that defendant was in an age-restricted store when Gerba approached him and made those requests. In that setting, defendant reasons, a reasonable person in defendant's position would have believed that Gerba was investigating him to determine if he should be in the store, and he therefore was required to remain and interact with Gerba.

We agree that the age-restricted nature of the store provided significant context for determining whether anything in the content of Gerba's questions made what would otherwise be a "mere encounter" an exercise of police coercion. Asking a person his or her age in such a setting with no accompanying exercise of authority to restrain, however, would not cause a reasonable person to believe that the officer had *significantly* restricted his or her liberty.[18] To the contrary, at most, a person so questioned might reasonably

---

[17] When Gerba contacted dispatch to verify the validity of defendant's license, he did not ask dispatch to check anything else. That verification occurred swiftly—Gerba returned the licenses within 10 to 15 seconds, defendant and his girlfriend then continued their shopping, and Gerba left the store to continue his security watch outside. Although Gerba did not ask dispatch to check anything else, dispatch did so, and as Gerba was leaving the store dispatch called him to tell him that defendant's license was suspended (it was, in fact, revoked) and that defendant was currently on probation. Because Gerba neither requested that later-provided information nor did so in defendant's presence, we do not have the occasion in this case to decide whether and under what circumstances additional checks (such as one for outstanding warrants) might convert the encounter into a seizure.

[18] The trial court explicitly found that Gerba made the inquiries that he did in an effort to determine whether defendant was under the minimum age required to be in the store. The trial court also found that Gerba's purpose was protective—he wanted to make sure that defendant was not exposed to the explicit materials on display in the store if, as Gerba suspected from defendant's physical appearance, defendant was too young to be in the store. Those findings on the officer's subjective intent and state of mind do not control the analysis. They have some relevance, however, insofar as they reflect a state of mind consistent with the officer's objective actions, his behavior, and the overall context of the encounter.

expect to be told to leave if he or she either would not or could not produce valid identification sufficient to verify that he or she was not a minor. That consequence, however, would not be coercive for purposes of Article I, section 9. As this court observed in *Ehly*, where police advised the defendant that he had to leave his motel room and asked him to return the key, "it would be anomalous to conclude that a request of this nature made by officers whose avowed intent was to get a person to leave" was a seizure of the person. 317 Or at 78. Put simply, even a coercive ejection of a person who has no lawful right to remain on premises (and here, such an ejection was at most a prospect, not a present reality) is not a restriction on the person's liberty—no liberty to remain exists in that circumstance.

Equally important, a reasonable person engaged in an age-restricted activity would expect to be questioned about his or her age, particularly if the person objectively appears close to the minimum age or within an age range where it is customary (as for purchasing alcohol) to request proof of age. Proof-of-age requests and examinations are customarily made in those settings, by private proprietors of businesses (bartenders, clerks of stores where alcohol or tobacco are sold) as well as by law enforcement personnel. Asking a person's age and requesting proof of it is not conduct "significantly beyond that accepted in ordinary social intercourse" in that setting. *Holmes*, 311 Or at 410. A reasonable person shopping in a store where minors are not allowed would likely consider those questions appropriate and expected, even if they caused "inconvenience or annoyance"; a reasonable person would not reasonably view those questions, however, as conveying a significant restraint on the person's liberty or freedom of movement. *See id.* at 411 (a reasonable motorist encountering a motor vehicle accident would "expect some delay or interruption in his or her travel[; a]lthough possibly annoyed or inconvenienced ***, a reasonable motorist would appreciate being advised of what was happening").

Thus, consistently with the general rule that verbal inquiries ordinarily are not seizures, there was nothing distinctive about the content of Gerba's questions that caused

his mere inquiries to amount to a seizure.[19] Neither did the manner of Gerba's request to see defendant's identification amount to a seizure. Defendant points to nothing—and the record reveals nothing—to suggest that Gerba was over-bearing, intimidating, or coercive in his demeanor or behavior. Gerba merely asked for, and defendant complied with, his request for identification. Defendant was not seized as a result of Gerba's request.

Defendant nevertheless argues that, even if the deputy's *questioning* did not have the effect of seizing him, he was seized once Gerba had *obtained* his identification. Citing *Painter*, 296 Or at 425, defendant asserts that he was seized when Gerba accepted his license because he "was, in fact, unable to leave." *Painter* does not stand for the proposition that an officer seizes a person by simply accepting and looking at a person's identification after a noncoercive request; rather, at a minimum, some exercise of coercive authority by the officer, such as retention of the identification after examination and a continuation of investigatory activities, is required. *See id.* (seizure when officer retained defendant's identification and credit cards before frisking him, running radio check, and questioning him because the "[d]efendant was, in fact, unable to leave"). No similar exercise of coercive authority occurred in this case. Gerba did not "retain" defendant's license beyond a reasonable period for purposes of examining and verifying it, which was dispositive in *Painter*. Rather, Gerba held defendant's license for 10-15 seconds before returning it. We are hard-pressed to see how holding a person's license for no more than 15 seconds, pursuant to the person's voluntary production of that license, could result in a *significant* restriction of a person's liberty on that basis alone. For those reasons, we conclude that defendant was not seized when Gerba accepted and inspected defendant's identification.

---

[19] Justice Walters, in her concurrence, misunderstands the point of our preceding discussion. The point is not that the test for a seizure depends on whether the officer's "show of authority was expected, appropriate, or reasonable." 354 Or at 424 (Walters, J., concurring in the judgment). Nor is the point that the analysis turns on the reasonableness of the restraint, instead of the fact of restraint. *Id.* at 422. The point is to respond to defendant's argument. Thus, contrary to defendant's argument, the circumstances in which the officer made the request for defendant's identification did not convert that verbal request, which ordinarily is not a seizure, into an action that conveyed, as it must under the legal test that we adhere to, a significant restraint on the person's liberty or freedom of movement.

Alternatively, defendant argues that the nature of the encounter shifted when Gerba called the identifying information in to dispatch to check the validity of the license. As we have already concluded, an officer's verification of the validity of a proffered piece of identification is not conduct that *per se* would convey to a reasonable person that the person is being forcibly or authoritatively detained. That is especially true when, as here, the person has not previously been subject to any coercive or authoritative restraint. Here, Gerba simply took an action (a verification call to dispatch) that a reasonable person in defendant's place in such a circumstance would likely expect to accompany an officer's request to see identification. Within a matter of seconds, the verification was sufficiently complete for Gerba to return the licenses, wish defendant and his girlfriend a nice day, and leave them to go about their shopping. Gerba's action in calling dispatch to verify the license was not a coercive restriction on defendant's liberty. And certainly, it was not *significantly* so. For the 10 to 15 seconds it took for Gerba to make that call, defendant did not go from being a citizen with full liberty and freedom of movement to one who was seized for purposes of Article I, section 9.

### III.   CONCLUSION

In summary, we reaffirm that police requests for information or cooperation do not implicate Article I, section 9, as long as the officer does no more than seek the individual's cooperation through noncoercive questioning and conduct. A request for identification, in and of itself, is not a seizure. Nor is an officer's act of checking the validity of that identification, in and of itself, a seizure. For a request and verification of identification to amount to a seizure, something more is required on an officer's part. Either through the context, the content or manner of questioning, or the other circumstances of the encounter, the officer must convey to a reasonable person that the officer is exercising his or her authority to significantly restrain the citizen's liberty or freedom of movement.

Here, defendant was not seized either by Gerba's request to see defendant's identification or by Gerba's call to dispatch to check the validity of that identification. No other

circumstances, in combination with Gerba's requests and verification, would have led a reasonable person in defendant's position to conclude that the officer was restraining him. The trial court therefore correctly denied defendant's motion to suppress.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

**WALTERS, J.,** concurring in the judgment.

The majority holds that Article I, section 9, does not apply to the encounter in this case, in which a police officer approached defendant, asked for and obtained his identification, and investigated its validity. *State v. Backstrand,* 354 Or 392, 417-18, ___ P3d ___ (2013). I agree that the Oregon Constitution permits such an encounter when it is constitutionally justified, as it was in this case. Thus, I agree with the result that the majority reaches and concur in the judgment. I do not agree, however, that the Oregon Constitution does not apply to such an encounter and therefore permits it even when it is not supported by constitutionally sufficient justification. I write to explain my reasoning.

In my view, Article I, section 9, applies to the encounter in this case because the officer's communication and conduct would cause a reasonable person in defendant's position to believe that he was the subject of a criminal investigation and therefore that he must stop, respond, and remain until the immediate investigation was complete.[1] Thus, the encounter constituted a "seizure" under Article I, section 9.

My analysis does not end there, however. In my view, Article I, section 9 also permits such seizures when officers have constitutionally sufficient reasons for imposing such restraint. When, for instance, an officer has probable cause to believe that an individual has committed a noncriminal traffic infraction, the officer is permitted to stop the individual and investigate whether he or she in fact committed the infraction. Such investigation may include reasonably

---

[1] I understand that the trial court found that the officer was not investigating defendant for any wrongdoing, but was investigating whether a business owner was committing a crime by permitting defendant to enter or remain in the business and whether defendant was a potential victim of that crime. However, the officer did not explain the nature of his investigation to defendant.

related actions, such as asking for and checking identification. *State v. Watson*, 353 Or 768, 781-82, 305 P3d 94 (2013). When an officer has a reasonable belief that an individual is a witness to and a victim of recent or ongoing criminal activity, the officer may temporarily detain the individual and, if the officer has an objectively reasonable basis to do so, may ask for and confirm the individual's identification. *State v. Fair*, 353 Or 588, 614-15, 302 P3d 417 (2013). And, as Justice Brewer opines in his concurrence, an additional justification for a request for identification may be an officer's action taken to fulfill the officer's caretaking function. *Backstrand*, 354 Or at 436 (Brewer, J., concurring).

In this case, I would hold that the police officer's conduct was constitutionally justified. Article I, section 9, permitted the officer to detain defendant for a brief period under *Fair,* or, perhaps, pursuant to his community caretaking responsibilities, and, therefore, the officer did not violate the Oregon Constitution.

The majority's reasoning is different. The majority concludes that the encounter in this case was not a seizure. Consequently, the majority permits officers to initiate similar encounters without constitutional justification. Article I, section 9, has not before, and should not now, give officers that latitude.

In *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), this court described the initial encounter between a police officer and the defendant as nonintrusive, but determined that when the officer asked for, obtained, and quickly returned the defendant's identification, and then radioed for a "warrant check," the nature of the encounter changed. *Id.* at 19. The court found it "difficult to posit" that a defendant who was cognizant that the officer was investigating whether he was the subject of any outstanding warrants would feel free to leave. *Id.* The court concluded that the officer's inquiries and actions changed the situation from a noncoercive encounter to a "seizure" under Article I, section 9. *Id.*

In the present case, police officers similarly asked defendant for his identification, retained it briefly, and investigated its validity. Defendant similarly and reasonably would have believed that he was the subject of a criminal

investigation and therefore must remain until the immediate investigation was complete. It is a crime for a minor to misrepresent his or her age to secure a benefit which by law is denied to minors, ORS 165.805. Likewise, it is a crime for an individual of any age to act in a manner that prevents or attempts to prevent an officer from performing his or her lawful duties, ORS 162.247(1)(a), or to give false information to a police officer when a person is being cited for a crime, ORS 162.385, or to an officer who is enforcing motor vehicle laws, ORS 807.620. Although defendant did not commit any of those crimes, he reasonably would have believed that the officer's investigation of the validity of his identification was a part of an investigation of one or more of those crimes, and, as in *Hall,* that he was not free to leave. *See* Aidan Taft Grano, *Casual or Coercive?: Retention of Identification in Police-Citizen Encounters*, 113 Colum L Rev 1283, 1309 (2013) ("When police retain an individual's identification, the act could be conceived either as a physical restraint (seizure *of* identification) or as a show of authority (seizure *by* identification).") (emphasis in original); Josephine Ross, *Can Social Science Defeat A Legal Fiction? Challenging Unlawful Stops Under the Fourth Amendment*, 18 Wash & Lee J Civil Rts & Soc Just 315, 336 (2012) (citing to study indicating that a "majority of respondents would not feel free to leave a police officer who questioned them"); David K. Kessler, *Free To Leave? An Empirical Look at the Fourth Amendment's Seizure Standard*, 99 J. Crim L & Criminology 51, 53-54 (2009) (presenting empirical evidence that people do not feel free to leave when being interrogated by officers); Janice Nadler, *No Need to Shout: Bus Sweeps and the Psychology of Coercion*, 2002 Sup Ct Rev 153, 155 (2002) ("In many situations where citizens find themselves in an encounter with the police *** a reasonable person would not feel free to terminate the encounter.").[2]

The majority disagrees. The majority characterizes the officer's inquiries and actions as "no more than seek[ing]

----

[2] I do not cite this research to demonstrate that many people feel an internalized inclination to cooperate with police officers, but to demonstrate that, in a circumstance in which an officer asks for, obtains, and investigates a person's identification, reasonable people would conclude that the officer had restrained their liberty.

the individual's cooperation through noncoercive questioning and conduct." 354 Or at 417. The majority then concludes that "something more" is required to make the officer's investigation a seizure. *Id.* at 417. The majority does not overrule, clarify, or distinguish *Hall*, nor does it now "posit" that an individual who reasonably would believe that he or she was subject to a criminal investigation would feel free to leave. *Id.* at 412. Rather, the majority reasons that a reasonable person in defendant's position would "*expect*" to be questioned about his or her age, to produce proof of age, and to have its validity investigated, *id.* at 415, and would deem such investigation "*appropriate,*" *id.* at 415 (emphases added). Further, the majority concludes, the officer's retention of defendant's identification did not extend "beyond a *reasonable* period," *id.* at 416 (emphasis added), did not constitute a "*significant*" restraint on defendant's liberty, and therefore was not a seizure. *Id.* at 417 (emphasis in original).

The change in analysis from *Hall* to *Backstrand* is striking. Not only does it break faith with *Hall*, it does not meet the challenge that Justice Harlan set and that this court quoted in *State v. Campbell*, 306 Or 157, 165, 759 P2d 1040, 1044-1045 (1988) (quoting *United States v. White*, 401 US 745, 786, 91 S Ct 1122, 1143, 28 L Ed 2d 453 (1971) (Harlan, J., dissenting)):

> "[I]t is the task of the law to form and project, as well as mirror and reflect, [and] we should not, as judges, merely recite the expectations and risks without examining the desirability of saddling them upon society."

Article I, section 9, prohibits unreasonable seizure. The first step in an analysis under that provision, therefore, is whether a police officer has restrained an individual's liberty and thereby effected a seizure. *See [State v. Ashbaugh](#)*, 349 Or 297, 308-09, 244 P3d 360 (2010) (so holding); *State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991) (seizure occurs when an officer "temporarily restrains a person's liberty"). The second step is whether that seizure is constitutionally justified or otherwise reasonable. *Ashbaugh*, 349 Or at 309. The majority, in terms today's Oregonians would understand, puts the trailer before the bike: The majority measures whether there has been a seizure by factors that more

appropriately address the second step in the analysis—whether the officer who effects the seizure has acted "reasonably." *See Watson*, 353 Or at 783-84 (reasonableness of duration of records and warrants check considered in deciding whether seizure was reasonable, not in deciding whether seizure occurred).

In *Fair*, also decided this year, the court explained that a seizure occurs when an officer engages in a "show of authority that would cause a *reasonable person* in [the] defendant's circumstance *to believe that [his or] her liberty had been significantly restricted*." 353 Or at 615 (emphases added.) The majority now states that, to constitute a seizure, the officer's show of authority must cause a "*reasonable person* to believe that the officer *intentionally and significantly has restricted, interfered with, or otherwise deprived the citizen of the citizen's liberty or freedom of movement*." 354 Or at 403 n 11 (emphases added). In this case, I would expect the court to begin, under either formulation, by considering whether the officer's show of authority would cause a reasonable person in defendant's position to believe that the officer had restricted his freedom of movement, and then to decide whether the restraint, if any, was justified and otherwise reasonable. The majority does not do so. Instead, it points to the factors that may be relevant at the second step of the analysis—whether the seizure was reasonable—to decide that no seizure occurred.

As noted, the majority explains that no seizure occurred because a young person present in an age-restricted shop reasonably "*expect[s]*" questions about his or her age and finds them "*appropriate*," *id.* at 415, and reasonably "*expect[s]*" that if he or she produces identification, a police officer will examine it and take steps to verify its validity, *id.* at 417 (emphases added). The majority concludes that the officer's retention of defendant's identification was of "*reasonable*" duration and did not constitute a "*significant*" restraint on defendant's liberty. *Id.* at 416 (emphasis added). The majority thereby determines whether a seizure occurred, not by analyzing whether a reasonable person would believe that an officer had restricted his or her liberty, but by determining whether a person subject to such restraint would believe the officer to have acted reasonably.

To illustrate the significance of the shift in focus from restraint to reasonableness, I pose the following hypothetical circumstance—a circumstance in which a police officer informs an individual that the officer is conducting a criminal investigation and, as a part of that investigation, *explicitly directs* the individual to remain and produce identification. In that circumstance, I venture that the majority would hold that the officer had seized the individual because the officer's show of authority would cause a reasonable person to believe that the officer had restricted his or her freedom of movement. *See id.* at 410-12 (discussing cases in which the court held police action "sufficiently coercive to result in a seizure"). I also venture that the majority would consider that explicit communication to be a seizure without regard to whether the individual expected it or considered it appropriate, and even if the officer's retention of the identification was not of unreasonable duration.

In the circumstance in which a police officer does not explicitly order an individual to halt and produce identification, but approaches the individual and requests, obtains, and investigates the individual's identification, the question should be whether the officer nevertheless communicates that the individual is not free to leave. *See* Nadler, 2002 Sup Ct Rev at 188 ("For example, citizens generally do not interpret 'Can I please see your license and registration?' as spoken by a police officer as a genuine request; it is a command, and everyone understands this.").

In urging that analysis, I do not challenge the majority's statement of an objective test—whether the officer conveys a message that would cause a reasonable person to believe that the officer had restricted the person's freedom of movement. I also do not mean to imply that a seizure occurs whenever "an individual—for reasons personal to that individual—feels obliged to cooperate with the officer simply because of the officer's status." 354 Or at 402. I agree that the focus must be on the message that the officer conveys, and that when an officer conveys only his or her status, the officer does not effect a seizure, even though an individual may feel it would be polite to remain. The point that I want to make is that, when a court looks at the message that an officer conveys, the court should look at whether the officer

conveys a message of restraint, not at whether the officer's message was expected, appropriate, or reasonable.

I am not sure why the majority focuses its inquiry on reasonableness rather than restraint.[3] I do know that in its discussion of the reasons that a seizure did not occur in this case, the majority introduces the notion that, when an officer "requests" an individual's identification and checks its veracity, the individual "consents" to the officer's conduct in a way that is "akin to when a person gives valid consent to search." *Id*. at 413.

In the search context, consent makes a search constitutionally permissible by demonstrating that the search, even though warrantless, is reasonable. *State v. Paulson*, 313 Or 346, 351, 833 P2d 1278, 1281 (1992). Consent does not make a search into noncoercive action to which Article I, section 9, does not apply. If the majority were to use consent in the seizure context in the same way that it considers it in the search context, it could be relevant to the reasonableness of the seizure, but would not make a coercive stop into "mere" conversation.[4] Perhaps for that reason, this court has not previously used consent as a factor in determining whether a seizure has occurred, and the majority errs in offering an individual's "expectation" that an officer will check the

_____

[3] It could be that what I perceive as a shift in focus is not so much a shift from *Hall,* but a return to *Holmes* and its discussion of what is "accepted" in social intercourse. *Holmes*, 311 Or at 410. If so, then my criticism in this case is a criticism of *Holmes* as well. What is accepted among peers does not tell a court what is communicated by a police officer. Although this case may not present this court with an opportunity to overrule or reconsider *Holmes*, that does not mean that we should extend its analysis. In *Hall*, which this court decided after *Holmes*, this court correctly focused on the message that an officer conveys by his or her exercise of authority. We should adhere to that reasoning.

[4] The majority also states that "[t]he person who waits while a consent search is completed is not thereby seized for purposes of Article I, section 9." 354 Or at 413. However, I do not understand the majority to take the position that defendant in this case consented to a search. If the officer had asked defendant for consent to search, and if a reasonable person in defendant's situation would understand that he or she was being searched, that would be another reason that a reasonable person would conclude that he or she was the subject of a criminal investigation and was not permitted to leave. Moreover, if the majority's proposition were determinative, then, contrary to the court's decision in *State v. Painter*, 296 Or 422, 425-26, 676 P2d 309, 312 (1984), a defendant who proffered identification in response to an officer's request would not be seized, even though the officer retained the identification for the entire time necessary to complete the investigation.

veracity of proferred identification as a consideration here. This court should adhere to the principle that "the privacy protected by Article I, section 9, is not the privacy that one reasonably *expects* but the privacy to which one has a *right*." *Campbell*, 306 Or at 164 (emphases in original).

The majority also errs in three other ways. First, the majority errs in concluding that, in the circumstances presented here, asking a person's age and requiring proof of age is not "significantly beyond that accepted in ordinary social intercourse." 354 Or at 415 (quoting *Holmes*, 311 Or at 410). Although bartenders or clerks may ask for proof of age when a young-looking person enters a bar or makes a purchase, it is the patron who initiates the encounter and seeks the benefit. In ordinary social intercourse, a stranger does not approach another and ask for proof of identification. Many reasonable people expect others to leave them alone unless they seek or need assistance, and Article I, section 9, protects that right to personal privacy.

Second, the majority fails to consider the ways in which its decision may encourage both the public and the police to act in ways that are contrary to societal interests. It is in the best interest of society that the public cooperate with police investigations and stop, respond, and remain until such an investigation is complete. By holding that an individual who reasonably believes that he or she is being subjected to such investigation is, instead, free to leave, the majority encourages public conduct that is contrary to that interest. It also is in the best interest of society that the public respect the police. By holding that officers are permitted to approach members of the public and ask for, obtain, and investigate their identification without constitutionally sufficient justification for that conduct, the majority encourages officers to act in ways that could diminish the esteem in which they are and should be held.

Third, the majority fails to state a standard for determining whether a seizure has occurred that all can understand and follow. In *Hall*, the police officer requested that the defendant produce identification, and then conducted a warrants check. The court nonetheless held that the officer had seized the defendant. 339 Or at 19. In this

case, the officer made the same request and conducted a similar investigation, but the majority holds that the officer did not seize defendant. 354 Or at 413-14. The majority holds that the officer merely sought defendant's cooperation. It is not easy to discern why the officer in *Hall* did "more." *Id.* at 417. I urge a brighter line and a rule that, when an officer approaches a member of the public and requests, obtains, and investigates that individual's identification in circumstances in which the individual reasonably would believe that he or she is the subject of a criminal investigation, the officer seizes the individual unless the officer clearly explains that the individual is free to leave and need not respond or remain.[5] Under that rule, phrasing and after-the-fact-matching would not determine constitutional rights. And, just as importantly, an officer with a constitutional basis for taking those actions, like the officer in this case, would be free to detain the individual for as long as reasonably necessary to complete the immediate investigation.

Because I believe that, in the circumstances presented in this case, Article I, section 9, required that the police officer have a constitutionally sufficient justification to approach defendant and ask for, obtain, and investigate the validity of his identification, I cannot join in the majority's reasoning. However, because I believe that the officer in this case was constitutionally justified in temporarily seizing defendant, I respectfully concur in the judgment.

Baldwin, J., joins in this concurring opinion.

**BREWER, J.,** concurring in the judgment of the court.

When, albeit politely, a uniformed police officer approaches a person on the street and requests the person's identification, it is a fiction to suggest that most people would believe that they have a right to refuse the request or that, if they did, it would be prudent or safe to do so. When they comply with such requests, as most law abiding persons

---

[5] I understand that an individual could still feel, as a result of his or her own internal belief system, that he or she should remain. However, whether a seizure occurs depends on the message that an officer conveys to a reasonable person, and, when an officer explicitly informs an individual that he or she is free to go, contrary feelings are not reasonable in the constitutional sense.

likely would do, it is generally fair to characterize such compliance as acquiescent, not consensual, voluntary, or, for that matter, the product of mere conversation. My concern is that, although this case involves very different facts, the majority's treatment of it may compel the conclusion that, as long as they do so in a civil manner, police are free, in the absence of any articulable justification, to ask anyone in a public place for their identification without effecting an unreasonable seizure of their persons or effects under Article I, section 9, of the Oregon Constitution. In my view, that would be unfortunate and, likely, unnecessary, in light of the circumstances of this case.

Article I, section 9, provides, in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

Unlike the protections of the Fourth Amendment to the United States Constitution, the protections afforded by Article I, section 9, including the right to exclude unlawfully obtained evidence, are not aimed at deterring police misconduct; instead, they safeguard liberty rights that inhere in the people. *State v. Thompkin*, 341 Or 368, 379, 143 P3d 530 (2006). As pertinent here, the government is prohibited from violating those rights by means of unreasonable seizures. A seizure of a person is a significant interference with the person's liberty of movement. *State v. Holmes*, 311 Or 400, 409, 813 P2d 28 (1991).[1]

The first question here—which is where the majority begins and ends its analysis—is whether defendant was seized when the police officer requested or later held, for a brief period, his identification. This court has struggled earnestly to give meaningful content to the inquiry

---

[1] I am aware that this definition of seizure omits parts of the longer and more convoluted definition set out in *Holmes*, and as later modified in *State v. Ashbaugh*, 349 Or 297, 313, 244 P3d 360 (2010). In particular, I have left out any reference to the mental state animating the officer's conduct, and I have not mentioned the possibility that a seizure could occur, regardless of whether the officer actually had significantly interfered with a person's liberty of movement, where a reasonable person would believe that such interference had occurred. Baked, but not frosted, significant interference with a person's freedom of movement is the essence of a seizure.

into whether police-citizen encounters involve a significant interference with a person's liberty of movement. This court held in *Holmes*:

> "[L]aw enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful. A street or public place encounter does not amount to an Article I, section 9[,] 'seizure' merely because the encounter may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer. Even physical contact does not transform the encounter into a 'seizure' if it is a normal means of attracting a person's attention (*e.g.*, policeman tapping citizen on the shoulder at the outset to get a citizen's attention). *See* LaFave, 3 Search and Seizure, A Treatise on the Fourth Amendment 413, § 9.2(h) (2d ed 1987). Rather, the encounter is a 'seizure' of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens."

311 Or at 410. *Cf.* Wayne R. LaFave, 4 *Search and Seizure* § 9.4(a), 581-82 (5th ed 2012) (observing that "the confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse[,]" which include moral and instinctive pressures to cooperate).

For some time, courts in Oregon and elsewhere wrestled with a formulation of the *Holmes* test that asked whether a reasonable person, in the position of the subject citizen, would feel free to terminate or leave the encounter. *State v. Ashbaugh*, 349 Or 297, 313, 244 P3d 360 (2010). That formulation, which was borrowed from Fourth Amendment case law, was especially problematic and ultimately unhelpful because, for among other reasons, any viable test for the existence of a seizure cannot depend solely on how a typical reasonable person would react to contact with an inquiring police officer. As one commentator has explained:

"[I]f [the free to walk away language] is taken to mean that a pedestrian whose movements have been interrupted and who is questioned is likely to feel free to depart without responding, it is a highly questionable conclusion. As noted in *Illinois Migrant Council v. Pilliod*[, 398 F Supp 882 (ND Ill 1975)]: 'Implicit in the introduction of the [officer] and the initial questioning is a show of authority to which the average person encountered will feel obliged to stop and respond. Few will feel that they can walk away or refuse to answer.' This, it is submitted, is an accurate characterization of the great majority of situations in which an officer approaches a pedestrian and seeks an explanation for his activities or even identification. Thus, if the ultimate issue is perceived as being whether the suspect 'would feel free to walk away,' then virtually all police-citizen encounters must in fact be deemed to involve a Fourth Amendment seizure. The [standard] should not be given such a literal reading as to produce such a result."

LaFave, 4 *Search and Seizure* § 9.4(a) at 579-80.

In an effort to clarify the limits of police inquiries that do not amount to a seizure, this court has recently explained:

"[A] law enforcement officer constitutionally may halt and briefly detain a person passing through a public area as a means to engage the citizen long enough to impart information or seek the citizen's cooperation or assistance. As *Holmes* emphasized, police are free to 'approach persons on the street or in public places, question them, and even accompany them to another location without the encounter necessarily constituting a 'seizure' of a person[.]' 311 Or at 409. As [*State v. Gerrish*, 311 Or 506, 815 P2d 1244 (1991),] emphasized, especially in the case of a motorist, halting and briefly detaining a citizen, even when done pursuant to an officer's show of authority, is often a nonintrusive and socially inoffensive way to seek a citizen's cooperation or impart information. 311 Or at 513. The important distinction in both cases was the public nature of the encounter and the practical reality that authoritatively halting the passing motorists is often the only practical means for police to have an exchange with them. No seizure occurs because the police conduct is not a socially intrusive exercise of police authority in those particular settings and circumstances."

*State v. Fair*, 353 Or 588, 598, 302 P3d 417 (2013) (footnote omitted).

The majority rightly points out that most people accept the need to give identifying information in public settings, including in commercial transactions and in entering public buildings. But that isn't this case. Here, defendant was in a public place—a store. Although the proprietor had a right, indeed a duty, to ascertain his age if there was a legitimate question about his presence in age-restricted premises, if another person in the store had asked to take and examine his identification, the intrusion would palpably exceed the bounds of socially acceptable behavior. For me, it is insufficient to say that police have authority to seek information and cooperation from citizens in public places. They do, depending on the circumstances. But, because requests for cooperation can take many forms and cover a full spectrum of intrusiveness, the devil is often in the details. People don't ask each other for identification in ordinary public encounters, no matter how politely the request is phrased. Put more bluntly, we don't live in a society where it is acceptable for someone to approach another person in a public place and ask for—let alone take, examine, and verify—"their papers." For that reason, it is far from clear that the police are entitled to take such actions either, unless, of course, the circumstances make them reasonable.

I would be remiss in failing to acknowledge that this court in *Holmes* and in later decisions, including *Fair*, appears to have rejected concerns similar to the ones that I have just expressed. In *Ashbaugh*, for example, the court stated that, even though the officer "asked defendant a question that one private citizen ordinarily would not ask another," there was nothing about the officer's words that would be perceived as a show of authority that restricted her freedom of movement. 349 Or at 317. Accordingly, the court concluded that a reasonable person in the defendant's position would not believe that the officer had significantly restricted her liberty of movement. *Id.* at 316. The same point has been made in different words by Professor LaFave:

> "The critical factor is whether the [police officer], even if making inquiries a private citizen would not, ha[ve] otherwise conducted [themselves] in a manner which would be perceived as a nonoffensive contact if it occurred between two ordinary citizens."

LaFave, 4 *Search and Seizure* § 9.4(a) at 582-83.

Frankly, I am hard pressed to make sense of such statements, because they shed little light on whether a person's liberty of movement has been significantly restricted by an investigatory request during a police encounter. Although courts and commentators have described citizen deference to such requests as voluntary or consensual, I submit that those descriptions merely indulge an unhelpful fiction. Even though the majority appears to take a critical view of such assumptions, the standard that this court has adopted for determining whether a seizure has occurred under Article I, section 9, that is, whether "a reasonable person [would] believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement," 354 Or at 399, necessarily hinges on assumptions—to paraphrase the majority—about "how police and citizens do or should interact" during such encounters. 354 Or at 401 n 9. Without further elaboration, that standard is, with respect, logically unsatisfying. Its underlying premise that police can ask for cooperation that a private citizen would not, as long as the police conduct otherwise would not be perceived as offensive if it occurred between two ordinary citizens, *Ashbaugh*, 349 Or at 317, simply meets itself going and coming. There should be a more principled and pragmatic way to resolve these issues, and I think that there is.

That approach should entail narrowing to a more straightforward and realistic scope what we mean by "mere conversation" between citizens and police officers and then assessing the constitutionality of seizures that exceed that threshold under the reasonableness standard that the text of Article I, section 9, imposes. Under such an approach, police are authorized to use ordinary means of communication to divert or restrict others in their activities or paths of travel in public places to the same extent that anyone else would, even if it involves a request for help in doing their jobs. But a request for identification transcends that type of ordinary interaction. Where, as here, a police officer makes such a request in an investigatory capacity, a citizen likely will believe that he or she cannot safely or prudently refuse and, thus, merely yield to an intrusion that otherwise would not be acceptable in ordinary social intercourse. And,

frankly, that is what should be expected so as to encourage peaceable encounters between citizens and the police.

It follows that police conduct that would suggest to a reasonable person that the person is the focus of a police investigation, and that the person is obligated to cooperate until the investigation is completed, should be understood for what it is: a constitutionally significant interference with the person's freedom of movement. *See*, *e.g.*, [*State v. Hall*](), 339 Or 7, 19, 115 P3d 908 (2005) (police seized the defendant when they took his identification for warrant check, because reasonable person would believe that his or her freedom of movement had been restricted when person is subject of pending warrant check); *Thompkin*, 341 Or at 378 (same). In my view, that is what happened here. The officer approached defendant and his companion in an adult bookstore with a posted 18-year minimum age and asked their ages. Apparently not satisfied with defendant's answer, the officer then asked to examine their identifications. After doing so, the officer called dispatch to verify the validity of the licenses. In combination, those actions would communicate to a reasonable person in defendant's position that he or she was the subject of a police investigation and must cooperate until the investigation was completed. Accordingly, I would conclude that the officer seized defendant by requesting, taking, and running through dispatch defendant's identification.

The question remains whether the seizure was "unreasonable" for purposes of Article I, section 9. "Unreasonable" means "not governed by or acting according to reason *** exceeding the bounds of reason." *Webster's Third New Int'l Dictionary* 2507 (unabridged ed 2002). "Reason," in turn, is defined as "[a] statement offered as *** a justification of an act," "a rational ground or motive," or "a sufficient ground of explanation or of logical defense." *Id.* at 1891. Thus, a particular action such as the seizure of a person is "unreasonable" when there is no rational justification for it. I am aware of no relevant context or historical evolution in the meaning of the word "unreasonable" or its roots that suggests that the framers of the Oregon Constitution would have

understood its meaning differently in adopting Article I, section 9.[2] By prohibiting "unreasonable" seizures, Article I, section 9, embodies a standard that is naturally adaptable to the temporal milieu in which it must be applied. The challenge today, as always, is the pliability of the term as it applies to particular circumstances and the discernment of like patterns of circumstances.

At first blush, it might seem odd—indeed, unnecessary—to reach that issue in this case. After all, if, having unmasked the fiction that the interaction in this case involved mere conversation, the court were to conclude that a seizure occurred, then there is little room for the state to maneuver under the three-category model of police-citizen encounters that the court recognized in *Holmes*. As the court recently reiterated:

> "Analytically, police-citizen encounters typically fall into one of three categories that correlate the degree of intrusiveness on a citizen's liberty with the degree of justification required for the intrusion * * * At one end of the continuum are mere encounters for which no justification is required. At the other end are arrests, which involve protracted custodial restraint and require probable cause. In between are temporary detentions for investigatory purposes, often termed 'stops, which generally require reasonable suspicion. Both stops and arrests are seizures for constitutional purposes, while less restrictive encounters are not."

*Fair*, 353 Or at 593 (citing *Holmes*, 311 Or at 408-09) (internal citations omitted). Because the state does not assert that the officer had reasonable suspicion—let alone probable cause—to believe that defendant was engaging in criminal conduct, the circumstances here do not fit into any of

---

[2] From the unpaginated 1828 Webster's *Dictionary of American English*:

"Unreasonable: 1. Not agreeable to reason. 2. Exceeding the bounds of reason; claiming or insisting on more than is fit; as an unreasonable demand. 3. Immoderate; exorbitant; as an unreasonable love of life or money. 4. Irrational."

As pertinent here, the same source defined "reason" as:

"The cause, ground, principle or motive of any thing said or done; that which supports or justifies a determination, plan or measure * * *. A faculty of the mind by which it distinguishes truth from falsehood, and good from evil, and which enables the possessor to deduce inferences from facts or from propositions."

the three "typical" categories of permissible encounters. However, the court in *Holmes* elaborated that "[t]he three categories are guidelines only. They are neither exhaustive nor conclusive as to what police action is a 'seizure' of a person." 311 Or at 407-08. The circumstances of this case invite consideration of the issue whether another kind of seizure occurred that was reasonable.

Defendant and his companion were in an adult bookstore when the officer encountered them. The owner, operator, or manager of such an establishment has a statutory duty under the criminal code not to knowingly or recklessly permit an unaccompanied minor to enter and remain on such premises. ORS 167.080. The officer testified that he suspected, based on their appearances, that defendant and his companion were both under the age of 18. As explained below, under those circumstances, the request for identification was reasonable, not because the officer believed that defendant had committed a crime, but because the officer had a duty to protect minors from an unlawful display of obscene materials.

I acknowledge that there is no generic "community caretaking function." Whether law enforcement officers have specific functions is a matter of statutory law. ORS 133.033 provides:

"(1)   Except as otherwise expressly prohibited by law, any peace officer of this state is authorized to perform community caretaking functions.

"(2)   As used in this section, 'community caretaking functions' means any lawful acts that are inherent in the duty of the peace officer to serve and protect the public. 'Community caretaking function' includes, but is not limited to:

"(a)   The right to enter or remain upon the premises of another if it reasonably appears to be necessary to:

"(A)   Prevent serious harm to any person or property;

"(B)   Render aid to injured or ill persons; or

"(C)   Locate missing persons.

"(b)   The right to stop or redirect traffic or aid motorists or other persons when such action reasonably appears to be necessary to:

"(A)   Prevent serious harm to any person or property;

"(B)   Render aid to injured or ill persons; or

"(C)   Locate missing persons.

"(3)   Nothing contained in this section shall be construed to limit the authority of a peace officer that is inherent in the office or that is granted by any other provision of law."

In this case, protecting a minor from being the victim of a crime is properly inherent in the duty of a peace officer to serve and protect the public. Therefore, the officer in this case was authorized by statute to ascertain the age of defendant and his companion if the officer reasonably believed that they were underage. However, the mere exercise of an activity under ORS 133.033 does not ensure compliance with Article I, section 9. In particular, a warrantless seizure must be justified by an exception to the warrant requirement. *Holmes*, 311 Or at 407. The community caretaking statute is not an exception to the warrant requirement; it is the statutory expression of the well-settled precept that the actions of law enforcement officers, like all other government actors' actions, must be traceable to some grant of authority from a politically accountable body. *See State v. Bridewell*, 306 Or 231, 239-40, n 6, 759 P2d 1054 (1988). ORS 133.033 is such a grant of authority. Compliance with the statute is a necessary but not sufficient element of lawful police activity of the sort that the statute specifies. As the statute itself expressly states, the action must also be one that is not "otherwise expressly prohibited by law"; it must be a "lawful act[]." ORS 133.033(1) and (2). "Whatever the meaning of 'lawful acts' in the context of ORS 133.033, that meaning must be consonant with the state and federal constitutions." *State v. Dahl*, 323 Or 199, 205, 915 P2d 979 (1996). Thus, a "community caretaking" search or seizure (as distinct from a search or seizure for purposes of law enforcement) must fall within the ambit of ORS 133.033, and it must also meet

constitutional standards. The statute provides the predicate grant of authority, and the constitution specifies limitations on that grant.

This court has not had an occasion to fully explore the relationship between the range of community caretaking functions that ORS 133.033 authorizes and any particular exception to the warrant requirement under Article I, section 9. However, in assessing the constitutional reasonableness of warrantless seizures, other courts have concluded that police requests for identification in furtherance of lawfully prescribed community caretaking functions—as opposed to the detection or investigation of evidence relating to a crime—do not violate constitutional guarantees against unreasonable searches and seizures. In *State v. Vistuba*, 251 Kan 821, 840 P2d 511 (1992), the Kansas Supreme Court went so far as to characterize community caretaking or public safety encounters as a fourth type of lawful encounter (in *Holmes* terms) between police and citizens. In my view, subject to appropriate limitations that preserve the protections guaranteed by Article I, section 9, there is much to recommend the logic of those cases.

The concept of a community caretaking or public safety function stems from a recognition that "[l]ocal police have multiple responsibilities, only one of which is the enforcement of criminal law[.]" *State v. Acrey*, 148 Wash 2d 738, 64 P3d 594, 599 (2003); *see also Cady v. Dombrowski*, 413 US 433, 441, 93 S Ct 2523, 37 L Ed 2d 706 (1973). The modern police officer is a "jack-of-all-emergencies" with "complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses'; by default or design he [or she] is also expected 'to aid individuals who are in danger of physical harm,' 'assist those who cannot care for themselves,' and 'provide other services on an emergency basis.'" LaFave, 3 *Search and Seizure* § 5.4(c) at 263 (citing Am Bar Ass'n, Standards for Criminal Justice §§ 1–1.1(b), 1–2.2 (2d ed 1980)); *see also Acrey*, 64 P3d at 599 ("[M]any citizens look to the police to assist them in a variety of circumstances, including delivering emergency messages, giving directions, searching for lost children, assisting stranded motorists, and rendering

first aid."). To require reasonable suspicion of criminal activity before police can investigate and render assistance in these situations would severely hamstring their ability to protect and serve the public.

For those reasons, performance of a community caretaker function permits, in proper circumstances, police requests for, and the reasonable retention of, identification from people whom they encounter in the performance of their duties. *State v. Ellenbecker*, 464 NW2d 427, 428 (Wis App 1990); *see also O'Donnell v. State*, 409 SE2d 579, 582 (Ga App 1991) ("[C]onsidering [the driver] had voluntarily stopped in a public rest area, parked, and laid down in the vehicle late at night, causing [the] Trooper to have a legitimate concern primarily regarding his medical status, it was not unreasonable for the officer thereafter to initiate promptly a routine and limited inquiry to determine the driver's identity."); *State v. Brunelle*, 766 A2d 272, 274 (NH 2000) (holding that an officer's request for the driver's license and vehicle registration of the driver of a disabled vehicle was part of a limited community caretaking exception, and that such request was reasonable "in the event that any questions about the vehicle or [the trooper's] contact with the owner subsequently arose").

Of course, community caretaking authority is not an excuse for carrying out a criminal investigation of the person being assisted. Rather, such an encounter must be based upon specific, articulable facts establishing the need for intervention by an officer. *See State v. Page*, 140 Idaho 841, 844, 103 P3d 454 (2004) (officer stopping pedestrian to check on well-being exceeded community caretaking function by taking pedestrian's driver's license and running a warrants check; retention of driver's license constituted an unreasonable seizure); *People v. Gonzalez*, 204 Ill 2d 220, 224, 789 NE2d 260 (2003) (officer not entitled to request identification from passenger stopped under community caretaking function where state failed to explain how request served a public safety function).[3] In addition, once

---

[3] Nor is the community caretaking function a basis for police stop and frisk practices that are not based on reasonable suspicion that the person accosted has committed or is about to commit a crime. Police officers serve as community caretakers only when their actions are "totally divorced" from the detection,

it is determined that a person does not require assistance, a request for identification cannot be justified under the community caretaking doctrine. *State v. DeArman*, 54 Wash App 621, 774 P2d 1247, 1249-50 (1989) (holding that officer acting in community caretaking capacity had no reasonable basis to request identification once he determined that driver did not require assistance). However, if contraband or other evidence of crime is discovered incident to the lawful performance of an officer's duties under the community caretaker function, the officer need not ignore that which is discovered. LaFave, 3 *Search and Seizure* § 5.4(c) at 263-64 ("[E]vidence of crime is sometimes inadvertently come by when a person is searched for some purpose not directly tied to the objective of detecting criminal activity[.] *** If a reasonable and good faith search is made of a person for such a purpose, then the better view is that evidence of crime discovered thereby is admissible in court.").

Following an in-depth analysis of various concerns informing the community caretaking doctrine, the Supreme Court of Montana adopted the following three-part test to ensure its proper application:

> "First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating *** the protections provided by the Fourth Amendment, but more importantly, those greater guarantees afforded under [the state constitution]."

*State v. Lovegren*, 310 Mont 358, 51 P3d 471, 475-76 (2002); *see also Williams v. State*, 962 A2d 210 (Del 2008) (adopting same test under Delaware Constitution).

That test and the principles underlying it make good sense to me. They have the advantage of being practical in relation to a rational understanding of police duties

---

investigation, or acquisition of evidence relating to the violation of a criminal statute. *Cady*, 413 US at 441; *Bridewell*, 306 Or at 238.

and being more workable in the trenches than some other efforts to define and apply additional categories of permissible police-citizen encounters. *See*, *e.g.*, *People v. De Bour*, 40 NY2d 210, 352 NE2d 562 (1976).[4] They also are free of some of the confusing factual undergrowth that inheres in the line-drawing that is required under the broader understanding of the scope of mere conversation to which the majority subscribes and which, to be fair, this court, has historically endorsed. The sorts of split-second decisions that people—both officers and citizens—must make in often-spontaneous street encounters should not hinge so much on variations in tone of voice, demeanor, and the other indicia that the current state of the decisional law emphasizes.

So, where does that leave things in this case? The trial court found that, if anything, the officer was investigating whether defendant was the victim of a crime. The supporting evidence showed that, based on their appearances, the officer believed that defendant and his companion were underage. If defendant had been underage, and if the operator of the bookstore had recklessly or knowingly disregarded that fact, then defendant would have been the victim of a violation of ORS 167.080. As part of his community caretaking function, the officer's request, taking, and brief examination of defendant's identification to make that determination were reasonable under the circumstances. Because no unlawful seizure occurred, I respectfully concur in the judgment of the court.

---

[4] The New York court has adopted the following four-category model for permissible encounters:

"If a police officer seeks simply to request information from an individual, that request must be supported by an objective, credible reason, not necessarily indicative of criminality. The common-law right of inquiry, a wholly separate level of contact, is 'activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion.' Where a police officer has reasonable suspicion that a particular person was involved in a felony or misdemeanor, the officer is authorized to forcibly stop and detain that person. Finally, where the officer has probable cause to believe that a person has committed a crime, an arrest is authorized."

*People v. Hollman*, 79 NY2d 181, 184-85, 590 NE2d 204 (1992) (explaining *De Bour* model). One commentator has suggested that such an approach produces "more slide than scale." Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn L Rev 349, 394 (1974).